Good morning and welcome to the Ninth Circuit Court of Appeals. My name is Morgan Christen. I'm one of the judges on the circuit court. My chambers are in Anchorage, Alaska, so I'm visiting today in San Francisco. I'm sitting this week with my colleague, also a circuit court judge from San Francisco, I should say also a circuit court judge, comma, whose chambers are in San Francisco, Judge Bress. And we are delighted to welcome and thank Judge Feinerman, who's here as a volunteer from Chicago, helping us out on our calendar this week. I have just a little bit of housekeeping and then we'll jump in. First, I want to note for the record a couple of cases we have submitted that we will not be deciding with argument. Case number 1770303, Cervantes Castaneda v. Garland, will be submitted on the briefs. And 1771719, Singh v. Garland, is also submitted on the briefs. Our first case for argument is Tandon v. GN Audio, 21-15312. Counsel, are you ready? I know who you are. I just want to make sure that you're ready to go. And then, counsel, we'd have to do a sound check is why I'm trying to proceed this way. Are you able to hear us, counsel? Could you give me a thumbs up or some indication that you can hear me? Okay, great. And you can hear as well? The opposing counsel can hear and see? Yes? Okay, great. Those were not trick questions. They'll get harder later. I'm just trying to make sure we're set up and ready to go. Counsel, when you are ready, we are ready to hear your argument. Thank you, Your Honor. I'm ready. And this is Anthony Nguyen on behalf of Appellant and Plaintiff Ritesh Tandon. And may it please the court if I may request about three minutes for rebuttal? You sure may, but please keep track of your own time. You're responsible for watching the clock. Okay? And you can see it, right? Yes, I can, Your Honor. Thank you. Go right ahead. Okay, thank you. So I think this case really comes down to a matter of this is a matter that is not appropriate for summary judgment, at least for dismissal upon summary judgment. And I think it can be divided into essentially two categories, the FEHA claims and the 1102.5 claim. And, of course, there's the public policy claim. But I think, as the parties agree, that that claim survives if any of the underlying FEHA or 1102.5 claims survive. So focusing on the FEHA claims first, there's the discrimination claim and the retaliation claim. And just walking over the prima facie case, the evidence that has been submitted, and I think as the parties do not dispute that there are issues regarding whether or not Plaintiff was qualified for his position, was terminated, and was otherwise a member of a protected class. The issue comes from whether or not there were circumstances that would suggest discrimination. And we submit to the court that, based on the evidence established, that there certainly were circumstances suggesting discrimination. The first is that it appears that the environment that Mr. Cannon worked in was certainly an environment that either condoned or looked away from treatment that may be perceived as differential treatment based on Mr. Cannon's race. There are, of course, the interactions with Mr. Cannon and Sarah Gray, including his impression and suggestion that she disliked Indians, something that he specifically reported, not only to Ms. Gray, but to his prior supervisor, as well as his then-current supervisor, Mr. Reisinger. Is there evidence that she made that comment, or is that your client's understanding of what she was conveying through actions or gestures? So the evidence, as Mr. Cannon testified, was that she did make the statement, but he could not recall the exact verbiage of the statement, but that the words were, in effect, that she disliked Indians. And we cite to that, and we cite to that specifically again in our reply brief to show the exchange that happened in the deposition testimony. That was my question as well. And I think you described several instances of, you know, what I read from the record is there may have been a comment or statement. Is this right? He doesn't remember exactly what it was. He felt she was sort of giving him the cold shoulder gatherings and stuff. So she's not, was not his direct supervisor, yes? That's correct. Okay. And is the problem that there is a discrepancy in the record about how many times he complained about this to Mr. Reisinger, who was his direct supervisor, yes? There is, yes. I think collectively it was about 25 times regarding these particular interactions, but then that was divided up between not just Ms. Gray, but the former supervisor, Mr. Brinkman, as well as Mr. Reisinger. So he complained directly to Ms. Gray? Yes. Yes, he did, Your Honor. And is his testimony, I know your briefing says repeatedly that nothing was done. What is his testimony about what response he received even just verbally in these meetings? At best, there was a response from Mr. Brinkman that he would look into it, but then from our client's understanding, nothing was ever done because he never saw any interaction that, or any action that had taken place in response to it. And I believe that the defense, at least as far as their HR personnel, Mr. Copeland, he denies receiving any complaints or notice of any said complaints, despite our client saying otherwise. Is it your position that there was not a legitimate non-discriminatory reason for taking the action that was taken? Yes, Your Honor, and I could get to that if the court would like me to. I'm not trying to hurry you, but I do have the question, and maybe when you fashion your arguments, I'm asking that as a separate question apart from whether you think you can show prejudice. Of course, sure. Sorry, pretext. I misspoke. Understood. Yes, yes. So going back to at least the prima facie case, there's also evidence that he was excluded from meetings, not just with Ms. Gray, but specifically with his own team under Mr. Reisinger as the only Indian American employee, despite the fact that the responsibilities that were part of his duties would have encompassed being a part of these meetings. And, of course, this is something that Mr. Reisinger does not dispute. In his declaration, he admits that he excluded Mr. Tandon from meetings, but his justification, and this will tie into the issue regarding pretext as well, his justification is that Mr. Tandon supposedly, you know, he was only hardware-focused and Cisco-focused, and that otherwise he didn't need to be a part of these meetings because these were more software-centric, essentially. And that does get into my issue regarding pretext as well, which I'll get to. But just for the record, I also want to get to the retaliation prima facie case, which we've sort of been talking about as well. Of course, there is evidence that there were numerous complaints that Mr. Tandon had raised. And, again, this was throughout his several supervisors, as well as to Mr. Copeland, the HR personnel. And he also specifically said in response to him being excluded from a meeting, one of the key meetings in June of 2017, to Mr. Reisinger, why am I discriminated and not invited? Now, there's no requirement that he needs to use buzzwords or anything like that. But, of course, he did use a buzzword here. And, nonetheless, this comes after a history of several complaints that he raised to Mr. Reisinger, which, again, based on the record, there's no evidence of any kind of investigation that was done, despite their policies requiring otherwise. So assuming that we get past the prima facie case, which we submit or we believe that we should, we'll assume that the defendants have established a legitimate reason and the burden will shift back to us to establish a pretext. And I think here this really highlights what the crux of the case is, as far as the overwhelming evidence that there is pretext. I think the first and most obvious matter is the issue regarding their justification as to Mr. Tandon's termination. They justified by saying there was a strategy shift, that Mr. Tandon, his responsibilities were only really hardware-based, and they cite to 90% of Mr. Tandon's job responsibility being with Cisco, and that there were concerns that he supposedly could not lead or work with others. And I'll try to address that as quickly as I can. That is highly disputed because their own documentation shows that Mr. Tandon was responsible for Cisco and certainly not for 90% of his responsibilities, but for Microsoft, which the defense identifies in their own brief as a software-based business, as well as Google. And these entities are not only recognized by Mr. Tandon based on his testimony, but by the defense on their own records, their performance review, the latest performance review in 2016, specifically lays out and rates Mr. Tandon, not just for Cisco, but for Microsoft and Google as well, in which he was rated either above expectations or he was rated above expectations. And their own email, Mr. Reisinger's own email identifies when he was looking for a replacement for Mr. Tandon in November of 2017, specifically states that Ritesh covers mainly Cisco, Google, and Microsoft externally and inside our organization. So we have their own documents indicating that he covers several clients, not just Cisco. And there's certainly no suggestion that Cisco was only 90% considering that he was rated on Microsoft and Google as well. And specifically a replacement was looked for him to, for, for an individual that will cover those clients. And Mr. Reisinger even admits in his declaration that Microsoft quote generates the majority of GN enterprises revenue. Again, Microsoft is the responsibility of Mr. Tandon. Mr. Tandon of course also has significant software experience and, and background. And they're including being a software engineer specifically for Cisco for 11 years. And the strategy shift issue was never something that was brought to Mr. Tandon. There was never a discussion. I have a question about that. Is there some obligation for the employer to inform this employee of their strategy shift? I didn't understand that line in your, in your. Sure. I think that there isn't to answer the court's question, but it relates to the issue of prejects, because if there are concerns regarding the employee's ability to perform or, or if there, there, there any concerns regarding their ability to fit into the strategy shift, there's an argument that can be made that well, if there was that concern, maybe they could have discussed this with them. And this, particularly in relation to the issue regarding his supposed inability to, to lead or get along with others. Well, but wasn't it, doesn't the record tell me that that was raised several times. That was raised twice, including by Ms. Gray. Okay. Yes. That was raised once in 2015, which from our position was more recalitrant for basis based on his complaints. But that is correct. Your honor, it was raised in 2015. And he didn't receive any kind of warning, a formal warning. It was just a quote unquote notice. I ask you a little bit about that place is that is 2015, the email, the first email that was deemed unprofessional and concerning. Yes. Okay. Yes. What do we know about that email? In terms of what your honor, I'm sorry. What was the, did he get other feedback other than it was unprofessional? And there's concern about his communication style. I think. Right. Yeah. And I think, I think, and, and, and, and Mr. Channing even admitted, I think in email too, that he could have approached the situation differently just based on his tone of the email from, from his perspective. That's what I'm trying to get at tone in the emails. If I get an email with all capital letters, I think someone's hollering at me. If I get an email with an exclamation mark, you know, there's different, but I, but I think it is all written communication. Is that right? Yes, your honor. Okay. All right. Right. Kurt. And then there was, there was another situation in 2017 right before his termination. But our position here is that if, if this was really a significant concern where they thought that he would not be able to get along or work with others or lead others, then there would have been a discussion and exploration of this, but there wasn't, of course, the 2017 issue was never even brought to his attention because he was just terminated. And I do think this is inconsistent with their 2016 performance review. The last performance review, because as he was rated above expectations overall for his performance, that was specifically defined by the defendants as being quote, continually receiving feedback from subordinates, peers and customers that exceeds expectations. From our perspective, that disputes at the very least for summary judgment purposes, their position that he was supposedly incapable of leading or getting along with others when their own performance review rated by Mr. Reisinger, the same individual who of course made the decision to terminate him and is now claiming that he could not get along with others is saying here in his latest performance review that based on feedback from subordinates and peers, he exceeded expectations. So again, for purposes of summary judgment yarn, we do think that this case here, based on the evidence in their own documented evidence, that there's no other documented evidence suggesting otherwise outside of what we talked about. It shows pretext because there are inconsistencies. I'm sorry to run out of time. I'm sorry, your honor. I'm going to save the remainder of your time. Forgive me for interrupting, but I think you wanted to save it. Is that. I did your honor. And I think the other issues are basically played in our papers. So unless the court had any of your honors have any questions, I'll reserve the rest of my time. Any questions? No. No. Okay. That's what we'll do. Thank you. We'll hear from opposing council, please. Thank you. Morning, your honors. And may it please the court. This case is about a single adverse employment action. The decision to terminate Mr. Tandon's employment. And before I address some of the specific points that council just talked about, I just wanted to take a very quick step back and explain some of the context because I think that's really important here. The industry that GN is in has changed dramatically in recent years. People no longer want hardware, meaning a headset that can simply plug into a desktop phone in their office. What they want is software, meaning a headset that can also plug into a computer or to a cell phone or to a tablet and work seamlessly with all of the different software applications on those various devices, zoom or Microsoft teams, blue jeans, take your pick. So understanding this change, GN made the decision to change its strategic focus from hardware towards becoming a software based business. And there's no real evidence to dispute that in fact GN made this change. Mr. Tandon was terminated because he did not have the software skill set necessary for the strategic change. And that is the decision at issue in this case.  Mr. Reisinger did explain that to him at the termination meeting, although for purposes of summary judgment, what Mr. Tandon testified is during the termination meeting, he was just told that his position was being eliminated. So for purposes of summary judgment, he was told his position was eliminated, which of course is actually what happened. It sounds like the answer to Judge Bress's question is no. I don't mean to be blunt, but I'm trying to get you to answer the question. It sounds like until pre-termination was he told that? Your Honor, for purposes of summary judgment, when the court has to accept the plaintiff's argument is true, the plaintiff testified he was not told that. The answer is no. Yes, correct. Thank you. Go ahead. But as Your Honor correctly noted, there was no obligation to inform him of that. He was told his position was eliminated, which is 100% accurate. The position was eliminated. Nobody was rehired into this position. The duties were redistributed to individuals already in GN's workforce. And in fact— Opposing counsel has argued, though, that it wasn't just that the duties were absorbed, but that there was an advertisement placed to replace him. What about that, please? Your Honor, first off, the advertisement, the undisputed evidence here shows that the— I think it was the LinkedIn post that Mr. Tandon referenced was not actually to replace him. The LinkedIn post was for an entirely different position in GN's sales group. That is not his position. And you're saying it's uncontested. Can you help me out with that discrepancy? His position is he reviewed this LinkedIn summary and thought, oh, that kind of looks like mine. We have evidence from the HR department saying, no, we have reviewed this job posting, and it was not even for Mr. Eisenberg's strategic alliance group. Do you have a record site for that? Or maybe when you come back could you— Oh, you're not going to come back. I'm not going to come back. Sorry. I don't have the specific record. That was in Mr.— I can tell you it was in Mr. Copeland's reply declaration. In— Mr. Copeland, the HR representative. Thank you. I'll find it with that. Thank you. Your opposing counsel said that his responsibilities were not limited to Cisco. He tried to sort of suggest that he had Cisco, he had Microsoft, he had a couple other clients, if you will. And what does the record show in that regard? Well, Your Honor, the record shows that Mr. Tandon primarily did have responsibility for Cisco. The record shows that Mr. Tandon also had second-level authority for Microsoft. Mr. Tandon admitted in his deposition that the primary responsibility, the day-to-day manager of that partnership, was Maro Kahl, somebody who reported to Mr. Tandon. And Mr. Tandon testified that Mr. Kahl had day-to-day responsibility, and he only advised as an as-needed basis. So while, you know, for example, in the performance review, some of Mr. Tandon's metrics talk about the Microsoft revenue, by Mr. Tandon's own admission he was not directly responsible for that account. He had sort of second-level. And as Mr. Reisinger testified, he did give Mr. Tandon the opportunity to have a small part of the Google account, which, you know, he did have that, but Mr. Tandon determined that that was the smaller part. And in Mr. Reisinger's belief, looking at, you know, based on his day-to-day observation of what Mr. Tandon was doing, he believed that the vast majority, I think Mr. Reisinger estimated 90 percent of what he was actually doing on a day-to-day basis, was covering the Cisco partnership, which was of decreasing importance to GM. What about the performance reviews? There's some that are uneven. There's some that seem more positive. So how do you respond on that point? Well, actually, I think so. With respect to the performance review, I'll get to that point in just a second, but I think it's important to remember with the performance review, sort of as I was saying, that the reason for the termination was not that Mr. Tandon was, you know, an incompetent performer. He wasn't making 100 widgets per hour or whatever it may be. He was terminated because he did not have the skill set necessary for the new strategic plan, which was implemented for 2017 through 2019. Mr. Reisinger testified that GM operates on a three-year sort of strategic plan. But, counsel, you're repeating what your brief says, and I promise we've read the briefs. So if you could dig a little deeper and help me out with this question that Judge Bress is asking, it would be helpful. He wasn't told prior to termination that he didn't have the skill set. I don't think there's an obligation for the company to inform him of this strategic change in direction. So why isn't there a question of fact about whether he was performing adequately and had this software background? Why should we decide that he didn't raise a legitimate dispute about that? Well, Your Honor, because the – sorry. Can I finish just to – Judge Bress's question for just – That's what I was trying to get you to do, but go right ahead. Let's see. So just to finish that point, whether or not he was performing adequately under his then current, you know, his hardware-based role for Cisco, that does not show anything about whether or not he had the software skills necessary for the new job. And to answer your question, Judge Christin. But, yeah, so that is the point, right? Because as Judge Bress has just sort of teased out, he also had these other – he wasn't just working for Cisco. The record shows us that he was doing some work for Microsoft and some work for Google, I think. And so why isn't that a dispute of fact about whether he really had the background? Well, Your Honor, because this is – the reason it's not a dispute of fact is because Mr. Reisinger testified that, based upon his personal observation of what Mr. Tandon was doing, Mr. Tandon did not have these skills. And, again, by Mr. Tandon's own admission, he was not covering day-to-day on the Microsoft. That was Mr. Call's responsibility. Mr. Tandon was just supervising him. So, under the law, Mr. Tandon is – excuse me, Mr. Reisinger is entitled to make this decision to weigh sort of what Mr. Tandon – he believes Mr. Tandon's strengths are, based upon his personal observation over multiple years. And he is entitled to make that decision. And Mr. Tandon does not get to subjectively say, no, I actually was pretty good at that. And it's not for the trier fact to sit as a super-personnel department to say, actually, we think Mr. Reisinger was mistaken and we think Mr. Tandon was pretty good. I know it's a difficult question, though. And, of course, we take discrimination very, very seriously, including implicit bias. And so that's why we're asking questions about this written performance history, which I think I agree with Judge Bress. It's mixed. Could you speak to the documentary evidence, please? Sure. So I think it's also important to remember with – so you're right. The FY 2016 performance review is positive. That's Mr. Reisinger's – it's positive. There are – I think Judge Bress was referencing the assessment that the former supervisor, Mr. Brigolin, made as he was departing GN, wherein he said – again, it was mixed with respect to Mr. Tandon, although, actually, if you look at it, he was mixed but generally the lowest of all the different managers. But, actually, if anything, the positive performance review here, it actually – it supports GN's position insofar as Mr. Tandon's – is that Mr. Reisinger terminated his employment because he had discriminatory animus. But Mr. Reisinger had been either Mr. Tandon's direct supervisor or second-level supervisor for a number of years by the time of the termination decision. And if you look at that body of work, the evidence shows that Mr. Reisinger – actually, Mr. Tandon, he received positive performance reviews. This most recent one that we're discussing resulted in him receiving – I think it was 148 percent of his total bonus percentage, so a very large bonus. He received raises. He received stock equity. And then he was terminated at the end of 2017. Well, what changed during that period? It's not Mr. Tandon's Indian ancestry. Mr. Reisinger clearly knew that Mr. Tandon was Indian from, you know, long before then. What changed was the strategic shift. So the fact that Mr. Reisinger was giving him all these positive reviews and, you know, by his own admission, recognizing that he knew the Cisco partnership very well, it destroys any chain of causation suggesting that Mr. Reisinger harbored discriminatory animus. What about these comments about disliking Indians or his perception of that? Can you address that? Yeah, of course. I'd be happy to. I think that argument is really a distraction from the central issue for three reasons. First and foremost, as I think it was Judge Christian mentioned, hit the nail exactly on the head before. The evidence is undisputed that Ms. Gray had absolutely nothing to do with the termination decision. She was not a decision maker, and Mr. Reisinger did not even consult with her before making the decision. So that first and foremost should end the matter. But more so, but even so, for point two, Ms. Gray, the alleged comments that Ms. Gray made were made multiple years before the termination decision. Mr. Tandon could not remember exactly. He estimated at some point before 2015. So a temporal gap of that length, simply under this Court's own precedent, a gap of that length is too great to infer any causation between the two events as a matter of law. And third, and I think, Judge Bresch, you were getting to this point earlier, is that while Mr. Tandon has suggested that Ms. Gray said she hated Indians, there actually is no record of that, no evidence of that in the record. When he was asked on this point in his deposition, he was asked, what did Ms. Gray say, and he could not remember. So what the evidence shows is that— Well, that doesn't mean there isn't evidence. Am I correctly understanding the evidence is just his testimony, yes? Right, but what the—yes, you're right, the evidence is his testimony, but there's no evidence that Ms. Gray said anything that she hated Indians or otherwise was discriminatory about Indians. What the evidence— Counsel, why do you keep saying that? Isn't the—I really want to make sure we're not miscommunicating. Isn't the evidence limited to his testimony saying she left him with this impression by giving him a cold shoulder or comments that she made and he can't quote them? But I just want to make sure I've got a correct understanding of this. Yes, you're—I'm sorry, if I'm not talking clearly, the only point I'm trying to make is what Mr. Tandon testified was that Ms. Gray made a statement that he could not remember that led him to then believe that she hated Indians. But when he was asked about why he made—why that statement— why he believed that statement made—why that made him believe she hated Indians, ironically, his stated basis for that was his own national origin stereotyping of Ms. Gray, given that Ms. Gray is from the United Kingdom, and Mr. Tandon believed that individuals from the United Kingdom have an inherent animus against Indians. So, yes, the evidence is his testimony, but it's incredibly weak evidence and it says nothing—it's incredibly weak evidence. And— I think what your point is is that because we don't know what she said, we don't know whether Tandon's inference that he drew that she was— had animus towards Indians was objectively reasonable or not. Yes, I think that's—yes, you're right. You're on it. And so what he's given us—and again, I want to make sure, I think, as Judge Fineman does when I'm missing something, because we view the facts in the light most favorable, as you know. So I think he's testified to that, and then he's testified to other incidents where—I'm describing it in my summaries, in my words, as giving him the cold shoulder when he enters the room, you know, turning her back to him. I think whispering in his inference was that it was about him, you know, whispering and then laughing, that kind of thing. Yes?  Well, you know, what—there is no tether besides this alleged comment to his Indian ancestry. As, you know, recognized in the complaint, you know, there was— you know, Mr. Tandon had communication issues, and Ms. Gray was not the only one, and her team was not the only one to address those with Mr. Tandon. So, you know, just merely, you know, Mr. Tandon says he complained 20 to 25 times. Well, he doesn't say he complained 20 to 25 times about alleged racial discrimination. He says, oh, all these issues, I wasn't being invited to strategic— I wasn't being invited to the marketing team's meeting, or they weren't showing me their budget. Well, those traits of complaint, you can complain until you're blue in the face, but a complaint about just, hey, I don't think this person is supporting me very well, that is not—there's no tether to racial animus. Was he working remotely during this time? The team was in Denmark, or some of the team was in Denmark. He's here in California. Explain the geography of all these people. Sure, Your Honor. So, yeah, Mr. Tandon was based here in the Northern California area. GN, he did not—there was no—at that time and during Mr. Tandon's employment, GN Audio did not have a California base. He was here working remotely. Mr. Keim is another player working remotely down here in California. Mr. Call, another individual, was up in Seattle with Microsoft, but then Holger Reisinger was in Denmark or Germany, commuting between the fours, and Ms. Gray was based in the United Kingdom. Okay, that's helpful. Just one other point. I would like to respond to something that counsel said, this idea that, you know, Mr. Tandon was—was just not informed and that he said there was only two instances in the record where he was informed that he had these issues, which, again, kind of aren't the main reason for the termination decision but go towards why Mr. Reisinger decided that, you know, in light of the software skills, it wouldn't—may have made sense to sort of retrain him or have him take on more responsibilities. Mr. Reisinger testified, and Mr. Tandon never disputed, that Mr. Reisinger had very frequent conversations with him about not only his general work performance, about, you know, his inability to think strategically, or his, you know, substantive performance, but also his communication skills and his ability to work with people. Mr. Reisinger testified that he had those on some instances weekly or even more weekly basis, and, again, that is not—you know, Mr. Tandon never disputed that, so the idea that he only complained twice, that there was only two issues, that's just—that's unsupported by the record. And unless there's any further questions, Your Honor, everything else I think should be in the brief. I think we've got it. Thank you so much. Counsel, you reserved about just under three minutes. You want to go ahead? Thank you, Your Honor, and this is from Mr. Tandon's deposition. Question, did she ever tell you that she hated Indians? Answer, I'm trying to recall because some of the language, what she has used while we were talking during the first time, and I can say that, to the best of my recall, answer is yes. And the issue here, Your Honors, is that we're not talking about harassment in terms of proving harassment. We're talking about notice, and the fact is Mr. Tandon complained about his concern that she disliked Indians, as well as the entire hostile environment that we talked about before, and there was no response. There's still no evidence regarding any action that was taken, no investigation, despite their policies requiring it. That shows an environment in which they condone this type of behavior, whether it actually happened or not. Now, defense wants to qualify this as quote-unquote weak evidence. That's fine, but this is a summary judgment. We're not supposed to weigh the evidence. It can be weak evidence, but it's still disputed evidence that gets this past summary judgment. Well, it has to be material. I mean, the defense has come forward with some reasons that are on their face, legitimate, non-discriminatory, and I think at that point, assuming you've made the prima facie case, you have to come forward and show there's some inconsistencies or some weaknesses, and I think that's the hardest part for you. And so how do you respond specifically on the Cisco and the performance reviews? Because maybe this could have been handled better by the defendant, but you still have to come forward with evidence of pretext. So the positive performance reviews highlights the inconsistency, because he's otherwise an employee who's performing very well, but then yet there's no evidence showing or suggesting that he supposedly lacked the skills to move on with this new strategy shift. And this is also inconsistent with the fact that they were specifically looking for a replacement in November, right before his termination, identifying his position and the clients that he was responsible for, including Microsoft and Google, not just Cisco. And before my time's up, I just want to... I don't see that you were able to raise a genuine dispute about whether they were really advertising for his position. Is there an ER site, a record site that you want to point me to? Did I miss something? No, I think it's the LinkedIn article and I think the posting, but I think the best argument there is the fact that the month before, Mr. Greisinger specifically was looking for a replacement in that internal email. And if I may just have one last point here. The issue regarding him being told that his position is being eliminated, that's inconsistent with their strategy shift argument. Their strategy shift argument is used as a pretext to suggest, well, that they needed to get rid of Mr. Tandon, not that his position needs to be eliminated. And there's still no explanation for that. From our perspective, that was just used as a pretext, a cover, to hide the fact that they really just wanted to get rid of Mr. Tandon, but they're just calling it or hiding it under disguise of a strategy shift because there's no explanation for it otherwise. But nobody was hired to replace him. Is that right? Our position is that the individual who took over the responsibilities was Stephen Kim, who essentially handled the same duties. Even if the title wasn't senior director, it was still director. But he was previously employed by the defendant, correct? Correct, Your Honor. So the team went from eight people to seven people. And then everybody, whatever the number was, it was X. And then the team went to X minus one. And then the people who remained took over Mr. Tandon's responsibilities, right? Right. It was an internal hire promotion, essentially, if you want to call it that. Right. So the team was reduced in size by one. And surely it's not unlawful for a company to look at its team and say, you know what, we we no longer need X people. We only need X minus one people. Right. I agree, Your Honor. But I think the issue here is that if that was the case, then it wouldn't be necessarily positioned in elimination based on their excuse that it was a strategy shift. They could just say that we didn't want Mr. Tandon specifically and that we're removing Mr. Tandon, but they claim to him that it was a position being eliminated, which from our perspective, again, based on the role that was assumed after that wasn't actually the case. And again, based on the evidence regarding his responsibilities for software based companies, that Vince claims are software based companies, including Microsoft and Google. That's inconsistent, Your Honor. All right. No. All right. You're significantly over your time, so I'm going to stop you there. I want to thank you both for your arguments. Very, very helpful. We will submit that case and go on to the next case on the calendar.
judges: CHRISTEN, BRESS, Feinerman